```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-218-5
vs.                                )
                                   )
WILLIAM CHRESTMAN,                 )  February 23, 2021
                                   )  11:30 a.m.
              Defendant.           )  Washington, D.C.
                                   )
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

_**(All parties appearing via teleconference.)**_

<u>**APPEARANCES**</u>:

```
FOR THE UNITED STATES:    CHRISTOPHER BERRIDGE
                          U.S. Attorney's Office
                          For the District of Columbia
                          555 4th Street NW
                          Washington, DC 20001
                          (202) 252-6685
                          Email: christopher.berridge@usdoj.gov


FOR THE DEFENDANT:        KIRK REDMOND
                          117 S.W. 6th Street
                          Suite 200
                          Topeka, KS 66603
                          (785) 232-9828
                          Email:  kirk_redmond@fd.org

                          CHEKASHA RAMSEY
                          201 US Courthouse
                          500 State Avenue
                          Kansas City, KS 66101
                          (913) 551-6712
                          Email:  che_ramsey@fd.org

ALSO PRESENT:             CHRISTINE SCHUCK, Pretrial Services

Court Reporter:           Elizabeth Saint-Loth, RPR, FCRR
                          Official Court Reporter
```

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1              THE DEPUTY:  The United States District Court for

2      the District of Columbia is now in session.  Chief Judge

3      Beryl A. Howell presiding.

4              Matter before the Court, Magistrate Judge Case

5      No. 21-218-5, United States of America versus William

6      Chrestman.

7              Your Honor, for the record, pretrial agent

8      Ms. Christine Schuck is appearing via telephone.

9              Counsel, please state your names for the record

10     starting with the Government.

11             MR. BERRIDGE:  Good morning, Your Honor.

12     Christopher Berridge on behalf of the United States.

13             THE COURT:  Good morning, Mr. Berridge.

14             MR. REDMOND:  Good morning, Your Honor.

15     Kirk Redmond, First Assistant Federal Public Defender for

16     the District of Kansas for the Public Defender Office, and

17     Che Ramsey, the Branch Chief for the District of Kansas

18     Federal Public Defender Office, on behalf of Mr. Chrestman.

19             He consents to proceed via video.

20             THE COURT:  Okay.  So that's Mr. Redmond.

21             I'm sorry.  But could you speak a little more

22     slowly.  For some reason I am getting a bit of an echo,

23     Mr. Redmond.

24             So who else is on?  Is that Ms. Ramsey?

 1              MR. REDMOND:  It is, Your Honor.

 2              THE COURT:  Okay.  And you are both with the

 3      Federal Public Defender in Kansas; is that right?

 4              MR. REDMOND:  That is correct.

 5              May I make two procedural requests of the Court?

 6              THE COURT:  Yes.  Of course.

 7              MR. REDMOND:  Thank you very much, Your Honor.

 8              We would first move, under District of Columbia

 9      Local Rule 83.2(g), to appear on Mr. Chrestman's behalf.  We

10      certify he is indigent, that we are both certified to

11      practice before the District of Kansas, and that we have

12      read the criminal local rules.

13              We would also ask, under Local Rule 44.2, that

14      Ms. Ramsey and I both be permitted to participate with the

15      hearing.  If it's okay with the Court, Ms. Ramsey would

16      present our proffer, and I would present brief argument.

17              THE COURT:  Thank you.  Your motion is granted.

18              This is unusual for us, to have Federal Public

19      Defenders from other offices appear here; and, on behalf of

20      the Court, let me just thank you for stepping forward to do

21      this outside your own district.  It's enormously helpful to

22      our Federal Public Defenders here, given the number of cases

23      arising from the January 6th event, and your assistance is

24      much appreciated.

25              The Federal Public Defenders across the country

1    are very experienced, respected lawyers.  So this Court

2    really appreciates you-all stepping forward outside your own

3    district to continue your representation of Mr. Chrestman in

4    this case.  So your motion is granted, and with the

5    appreciation of the Court.

6           So let me just begin -- I know, Mr. Redmond, that

7    you said that Mr. Chrestman agrees to participate in the

8    video conference via -- participate in this hearing via

9    videoconference, but I do like to hear directly from each

10   defendant on this point.

11          So, Mr. Chrestman, you understand, so that the

12   record is clear, that this hearing is being held remotely

13   with counsel and Mr. Chrestman, the defendant, participating

14   via videoconference.

15          Mr. Chrestman, do you agree, after consultation

16   with your counsel, to participate in this hearing remotely

17   without being physically present in the courtroom here in

18   Washington, D.C.?

19          THE DEFENDANT:  Yes, I do, Your Honor.  Thank you.

20          THE COURT:  Okay.  Thank you.

21          I would like to remind anyone listening to the

22   hearing over the public teleconference line that, under my

23   standing order 20-20, recording and rebroadcasting of court

24   proceedings including those held by videoconference is

25   strictly prohibited.  Violation of these prohibitions may

1    result in sanctions, including removal of court-issued media

2    credentials, restricted entry to future hearings, or denial

3    of entry to future hearings, or other sanctions deemed

4    necessary by the presiding judge.

5          All right.  So, with that, let me just begin by

6    saying I have reviewed a number of papers submitted in

7    connection with today's hearing.  Certainly, I have reviewed

8    the Government's appeal of the Kansas magistrate judge's

9    release order.  I have also reviewed -- in addition to the

10   Government's motion, the complaint underlying the arrest

11   warrants in this case.

12          I have also reviewed the defendant's opposition to

13   pretrial detention that was filed in the District of Kansas,

14   and the memorandum and order setting forth the conditions of

15   release that was issued by the magistrate judge in Kansas.

16          And may I just thank Shelli Peterson, I don't

17   whether she's listening, but she is the Federal Public

18   Defender lawyer here in the District who forwarded those

19   papers from Kansas to the Court; so I appreciate her effort

20   in that respect so that I could have the full -- as much of

21   the record as possible.

22          So it's the Government's motion, so I am going to

23   begin, Mr. Berridge, with asking you some questions and

24   hearing from you first in support of your motion; but let me

25   begin with one, sort of, housekeeping matter.

1              This case -- has this case been fully unsealed at

2      this point?

3              MR. BERRIDGE:  Yes, Your Honor.  I apologize for

4      that clerical issue.  It was simply that we had not

5      submitted all the returns to the Clerk for processing.  It

6      was designed to be unsealed upon everyone's arrest; and

7      everyone was arrested on the same day.  It should have been

8      totally unsealed, and that's my fault.

9              But the record -- all of the returns have been in

10     to the Clerk, and the entire record should be unsealed.

11             THE COURT:  All right.  Good.  So that means I can

12     freely use the names of the co-conspirators who are charged

13     in this case; there are four of those individuals:  Louis

14     Colon, Christopher Kuehne, Cory Konold, and a Felicia

15     Konold.

16             And I understand that the Konolds are siblings; is

17     that correct?

18             MR. BERRIDGE:  That's correct, Your Honor.

19             THE COURT:  Okay.

20             MR. BERRIDGE:  And, actually, there is one

21     additional defendant, although he wasn't -- in a related

22     case; he was arrested yesterday in Kansas City in connection

23     with this same case and is charged by complaint as part of

24     that same conspiracy.

25             THE COURT:  And what is that additional

1      defendant's name?

2                MR. BERRIDGE:  His name is Ryan Ashlock.

3                THE COURT:  How do you spell the last name?

4                MR. BERRIDGE:  A-S -- A-S-H-L-O-C-K.

5                THE COURT:  I see.  Ashlock.  Okay.

6                So all the co-conspirators at this point have been

7      arrested; is that correct?  Is that correct?

8                MR. BERRIDGE:  That's correct, Your Honor.

9                THE COURT:  And so -- have they all been detained

10     or have they all been released?

11               MR. BERRIDGE:  Your Honor, the only defendant with

12     whom we have moved for detention is Mr. Chrestman.

13               THE COURT:  All right.  So that, of course, leads

14     to the obvious next question, which is:  What is different

15     about Mr. Chrestman that he is the only defendant charged in

16     this complaint that warrants detention in his case and not

17     his five codefendants?

18               MR. BERRIDGE:  Yes, Your Honor.

19               The first reason why it's different is because

20     Mr. Chrestman was the only one that we know of from the

21     conspiracy that was carrying a dangerous weapon during the

22     offense, and that is the ax handle that was initially

23     concealed with a flag as he was outside the Capitol but then

24     was subsequently used while inside the Capitol.

25               Further, he is the defendant who has obstructed

1    the most after the actual incident itself; attempting to

2    discard evidence in the case, physical evidence in the case;

3    and attempting to just obstruct generally in this case, Your

4    Honor.

5              THE COURT:  All right.  Well, what -- well, I

6    think we'll get to this.  But are all of the -- are all of

7    the codefendants also members of this gang calling itself

8    Proud Boys?

9              MR. BERRIDGE:  Your Honor, I can definitely talk

10   to that more.  I think this is, sort of, limited in a

11   spectrum.  Not everyone, I guess, would -- every defendant

12   would likely characterize themselves as members of the Proud

13   Boys.

14             The Konolds were, sort of, recruited last minute

15   to join the efforts while they were at the riots in

16   Washington, D.C.  There is no evidence that they were

17   members of Proud Boys prior to going to Washington, D.C.

18             Mr. Ashlock, Mr. Kuehne, Mr. Colon, and

19   Mr. Chrestman all were prior to going there.  We understand

20   that there is evidence now suggesting that, upon return,

21   they wished to not be a part of the Proud Boys anymore,

22   specifically Mr. Kuehne and Mr. Colon.

23             THE COURT:  All right.  So I have other cases in

24   front of me involving these members of this Proud Boy gang,

25   and that includes Nicholas Ochs and Nicholas DeCarlo; and

1    the Government didn't seek pretrial detention in that case

2    involving Proud Boys either, and they have been released

3    pending trial.  Also, the head of the Proud Boys, Enrique

4    Tarrio, is on pretrial release in our local court, D.C.

5    Superior Court.

6              So could you just -- is it all because of this ax

7    handle that the defendant was carrying into the Capitol that

8    the Government is asking for pretrial detention in his case

9    and not for the other Proud Boys, the two that are appearing

10   in front of me who have been indicted, Ochs and DeCarlo, and

11   Tarrio who is on pretrial release in superior court?

12             MR. BERRIDGE:  Your Honor, I guess, first, as it

13   concerns Mr. Tarrio, at this point Mr. Tarrio has not been

14   charged in district court regarding the January 6th

15   incident.

16             THE COURT:  Right.

17             MR. BERRIDGE:  I can't speak really to the

18   superior court case at all; I apologize for that.

19             THE COURT:  That's all right.

20             MR. BERRIDGE:  Regarding Mr. Ochs and Mr. DeCarlo,

21   I am actually the assigned prosecutor on that case.

22   Mr. Ochs and Mr. DeCarlo -- again, there was no evidence

23   that they were using a dangerous weapon.  As Your Honor

24   said, that is a difference; and the Government thinks that

25   that is a significant difference.

1         There is also -- in that case there was no charge

2    with 18 U.S.C. 231, which is a violation -- as Your Honor

3    knows, impeding federal law enforcement officers.  The Ochs

4    and DeCarlo case -- we have a conspiracy to commit 18 U.S.C.

5    1512(c)(2), obstructing Congress.  And, certainly, we think

6    that that's criminal conduct worth charging in a conspiracy;

7    and that's what we have done in this case.

8         We do think that Mr. Chrestman's actions were more

9    dangerous and more violent in nature with what he did,

10   especially threatening a law enforcement officer on scene

11   and using that ax handle to further obstruct law enforcement

12   while inside the Capitol.  And so we think that there is a

13   distinction between the case against Mr. Ochs and

14   Mr. DeCarlo in comparison to Mr. Chrestman's case.

15         THE COURT:  All right.  So you are calling this

16   long wooden club, say, an "ax handle."  Are you confident

17   it's an ax handle, or are you just surmising that's what it

18   looks like?  It hasn't been recovered; is that right?

19         MR. BERRIDGE:  That's correct, Your Honor.  It has

20   not been recovered.  We do believe that that was part of the

21   evidence that was discarded from the case.

22         We do believe it's an ax handle based off of

23   social media posts.  Also, when you look at certain videos

24   and photographs from the events, you can get, sort of, a

25   closer look at it.  And I apologize for not including, sort

1    of, the best angle for the ax handle; but we are fairly

2    confident that it is, in fact, an ax handle.

3              THE COURT:  Okay.  All right.  Thank you.

4              I was curious about that because it sort of looks

5    like a wooden club to me.  I wasn't -- I didn't know why you

6    were calling it an "ax handle," not that I am that familiar

7    with ax handles; but there you go.

8              Okay.  So a number of pictures that the Government

9    has provided have shown the defendant wearing three

10   different things on his head:  One was a baseball cap --

11   clearly, a baseball cap; one was a helmet, a hard-looking --

12   a hard-looking helmet; and then what the Government called a

13   "respirator," that looks to me like a gas mask.  So is there

14   a difference between a respirator and a gas mask, or are

15   you -- why are you calling it a respirator and not a gas

16   mask?  Is there a difference?

17             MR. BERRIDGE:  No.  I don't believe that there is

18   a difference.  I don't think that there is any sort of

19   significant difference.  I think we can call it a gas mask.

20             THE COURT:  Okay.  And is it a gas mask that could

21   be used to resist tear gas or something like that -- or bear

22   spray, which is what law enforcement might have employed to

23   deter the crowd?

24             MR. BERRIDGE:  That's our understanding, yes, Your

25   Honor.  But we obviously have not recovered that, so it's

1    sort of hard to see exactly what it was; but that would be

2    the Government's understanding.

3              THE COURT:   Okay.  So that was my other question;

4    have you recovered it?  Not recovered.  Okay.

5              MR. BERRIDGE:  No, Your Honor.

6              THE COURT:  Now, the Government does make mention

7    of the fact that the defendant had a rifle that, I guess,

8    the Government saw through social media posts, and that

9    rifle was missing from Mr. Chrestman's home when the

10   Government searched it.  And defense counsel makes a point

11   that, you know, this is a good thing, and that it is not

12   something to warrant pretrial detention, the fact that he

13   had removed the rifle from his home.

14             Doesn't defense counsel have a good point on that?

15             Why should the fact that he removed the rifle from

16   his home raise a concern about safety to the community as

17   opposed to be a point in Mr. Chrestman's favor for forward

18   thinking and taking action to remove that rifle?  Can you

19   explain that?

20             MR. BERRIDGE:  Yes, Your Honor.

21             So this is not entirely clear from the pleading,

22   and I apologize for this.

23             The rifle is a specific rifle; it's an

24   assault-type rifle.  But on it is printed the initials --

25   the acronym "POYB," which stands for Proud of Your Boy,

1     which is a very common --

2              THE COURT:  Could you speak a little bit more

3     slowly?  It has the initials on it -- what?

4              MR. BERRIDGE:  Sorry.  P-O-Y-B.

5              THE COURT:  POYB, okay.

6              MR. BERRIDGE:  POYB.  Which, as we understand --

7     the Government understands is a common acronym used in Proud

8     Boy parlance which means Proud of Your Boy; and also, on the

9     rifle, was a phrase that said, "The west is the best."

10             There is not a specific -- the Government is not

11    specifically concerned about that latter phrase; it's really

12    the first phrase that is of concern because it is Proud

13    Boys -- a Proud Boys logo that's on the rifle; and it's the

14    Government's contention that the firearm here that was

15    removed is evidence further of obstruction in this case, to

16    get rid of evidence of -- to get rid of evidence that

17    Mr. Chrestman was either associated with the Proud Boys and

18    that he was a person at the Capitol and who participated in

19    the riots.

20             THE COURT:  All right.  Well, does the Government

21    know about Mr. Chrestman's membership in the Proud Boys only

22    because he was seen talking to Proud Boys or being around

23    Proud Boys during the assault on the Capitol on January 6th?

24             MR. BERRIDGE:  No, Your Honor.

25             THE COURT:  All right.  So what is the other basis

1    for -- what is the other evidentiary bases for the

2    Government's information that this defendant is a member of

3    this Proud Boys gang?

4              MR. BERRIDGE:  Yes, Your Honor.

5              There is witness testimony to that effect and

6    there is also -- not "testimony," I'm sorry -- but witness

7    statements to that effect, and co-conspirator statements to

8    that effect as well.  Two of the co-conspirators have spoken

9    to law enforcement, and they've both identified

10   Mr. Chrestman as part of the Proud Boys.

11             Further, we have additional conversations, witness

12   statements, conversations with Mr. Chrestman and other

13   members of the Proud Boys in Kansas City.

14             THE COURT:  Could you say that last bit again?

15             MR. BERRIDGE:  Yes, Your Honor.

16             There are other witness statements for

17   Mr. Chrestman's conversations with Proud Boys members in

18   Kansas City --

19             THE COURT:  In Kansas City, okay.

20             MR. BERRIDGE:  -- attending meetings as well.

21             THE COURT:  I see.  Okay.  And is any of this from

22   social media posts or other electronic communications?

23             MR. BERRIDGE:  There are social media posts where

24   Mr. Chrestman appears next to Proud Boy, sort of, logos or

25   emblems -- there is a specific type of Proud Boy logo, it's

1    a yellow herald, half herald, that -- Mr. Chrestman appears

2    in, this is from Facebook.  There are other social -- there

3    are other identifiers that have Mr. Chrestman as part of the

4    Proud Boys.

5            THE COURT:  So the Government has said that the

6    defendant poses a serious risk that he will intimidate a

7    prospective witness or attempt to do so -- and I appreciate

8    that this is a conspiracy case.  There are five

9    co-conspirators in the case; two of whom the Government has

10   been fairly open, saying they are already talking to law

11   enforcement.

12           So is the Government, when it talks about this

13   risk of intimidation, concerned in particular about this

14   defendant posing some kind of intimidation or risk to the

15   co-conspirators and whether or not they will continue to

16   cooperate?

17           MR. BERRIDGE:  Yes, Your Honor.  That's correct.

18           It's also the Government's contention that there

19   are others yet to be charged, or yet to be identified

20   members of the conspiracy -- potentially in Kansas City,

21   though, potentially larger than that that Mr. Chrestman had

22   knowledge of; and that, if released, he could pose a danger

23   to any potential additional charged or uncharged defendants

24   and co-conspirators.

25           THE COURT:  All right.  Well, just because

1    somebody is charged in a conspiracy doesn't mean they

2    necessarily can pose a threat of intimidation to

3    co-conspirators who may take a more cooperative attitude

4    towards law enforcement.

5           So what is it particularly about Mr. Chrestman's

6    conduct or -- that leads the Government to believe that he,

7    in particular, poses an intimidation threat to witnesses in

8    this case?

9           MR. BERRIDGE:  Your Honor, I think the Government

10   is particularly concerned that as other members of the

11   conspiracy give information that particularly points to

12   Mr. Chrestman's relative responsibility for their conduct

13   there as the case progresses -- that's the primary concern.

14          At this point, Your Honor, the evidence points to

15   Mr. Chrestman being, sort of, the primary player in this

16   conspiracy, and that their continued -- their continued

17   discussion with law enforcement in this case that further

18   incriminates Mr. Chrestman is the real danger that the

19   Government is concerned why he would be, sort of, separately

20   situated from the rest of the co-conspirators.

21          THE COURT:  Okay.  Well, that's a little oblique

22   for me to be honest, Mr. Berridge.

23          MR. BERRIDGE:  Yes, Your Honor.

24          THE COURT:  You know, he is a primary player.  And

25   perhaps this goes to another one of the statements that the

1    Government makes, which is, the Government asserts that the

2    defendant readily recruited two individuals from Arizona to

3    join members of the Kansas City Proud Boys who then

4    participated in the crime spree on U.S. Capitol grounds --

5    and I'm quoting the Government's memo on page 22.

6            And the Government doesn't really spell out what

7    the evidentiary basis is for why the Government says that

8    this defendant recruited people to join the Proud Boys --

9    the rest of the mob on January 6th.

10           So what is that evidentiary basis for accusing him

11   of being a primary player in the conspiracy and for

12   recruitment because -- I mean, I would agree that somebody

13   who is recruiting other members is a primary player; but

14   then I am sort of at a loss to understand what the

15   evidentiary basis is for the assertion that he was a

16   "recruiter."

17           MR. BERRIDGE:  Yes, Your Honor.

18           So definitively the Konolds -- again, there is no

19   indication that there were a number of Proud Boys

20   anywhere -- let alone Arizona where they're from.  But that

21   when coming to Washington, D.C., they met -- they met Kansas

22   City Proud Boys, including Mr. Chrestman.  And then the

23   Konolds both specifically followed Mr. Chrestman through the

24   entirety of the Capitol -- both in and outside of the

25   Capitol.  Ms. Konold, Felicia Konold, was standing right

1    next to Mr. Chrestman and Cory Konold was standing right

2    next to Mr. Chrestman throughout the entirety of --

3            THE COURT:  And did the Konolds know Mr. Chrestman

4    before they arrived in D.C.?

5            MR. BERRIDGE:  We have no indication that they

6    knew each other before they arrived.  But we do have

7    indication that Ms. Konold specifically was, I guess,

8    sporting or displaying a Kansas City Proud Boys challenge

9    coin which is, sort of, like an identifier coin that other

10   members of the Proud Boys used to, sort of, self-identify

11   themselves as members of different chapters of the Proud

12   Boys.  So it does appear that she met -- that she met

13   Mr. Chrestman and the other Kansas City Proud Boys in

14   Washington, D.C. and then had some contact with them after

15   leaving.

16           THE COURT:  Okay.  So when you say "recruitment,"

17   you don't have evidence that he was recruiting people to

18   come to D.C. for the assault on the Capitol, or do you?

19           MR. BERRIDGE:  We don't have any indication that

20   Mr. Chrestman specifically recruited anyone at this point --

21           THE COURT:  Okay.

22           MR. BERRIDGE:  -- I'm sorry, prior to coming on

23   the 6th of January.

24           THE COURT:  Okay.  All right.

25           Were there a number -- I mean, were the people

1    from the Kansas City Proud Boys part of the gang all

2    together?  I mean, are they -- are they all part of a group

3    that went together into the Capitol on January 6th?

4         MR. BERRIDGE:  Your Honor, we have evidence to

5    suggest that several of them went together, at least at this

6    point, six -- I'm sorry, four of the Kansas City Proud Boys,

7    plus additional yet-to-be-identified Kansas City Proud Boys

8    who were going -- traveling together on the Capitol grounds

9    and then inside the Capitol grounds.

10        Your Honor doesn't have a pleading specifically

11   about Mr. Ashlock in front of her.  But Mr. Ashlock got

12   separated at one point from the rest of the Kansas City

13   Proud Boys.  There is plenty of evidence to suggest that

14   Mr. Kuehne provided orange tape to identify the members of

15   the Kansas City Proud Boys --

16        THE COURT:  The orange and yellow colors of -- the

17   gang colors that we hear --

18        MR. BERRIDGE:  Well, at this point it's orange

19   tape that was specifically used.

20        In fact, the Proud Boys were asked prior to going

21   to Washington, D.C. to specifically not wear their very

22   identifiable black and yellow Proud Boys memorabilia or

23   insignia but, rather, to dress in all black or less

24   recognizable clothing to blend in with the crowd.  And then

25   the orange tape was subsequently used by at least the Kansas

1    City Proud Boys to help identify each other in the crowd so

2    that they can tell who one another are in case that -- there

3    was some type of disturbance which, of course, there was.

4              THE COURT:  All right.

5              The Government asserts that among the grounds for

6    pretrial detention, in addition to dangerousness, is that

7    Mr. Chrestman also poses a flight risk; but the defense has

8    pointed out that he was at home at the time of his arrest

9    even after a media reports had identified him as part of

10   this mob that assaulted the Capitol on January 6th.

11             So is flight risk the Government's strongest

12   argument here for pretrial detention or are other bases the

13   primary reason for the Government's request for pretrial

14   detention?

15             MR. BERRIDGE:  No, Your Honor.

16             Flight risk is certainly not our -- the strongest

17   case on which we rely.  We specifically are relying on the

18   defendant's obstructive conduct and his risk of further

19   obstruction in this case but then, also, his danger to the

20   community when looking at the reason for pretrial detention.

21             THE COURT:  All right.  Well, let's get to danger

22   to the community because I was struck by one of the terms or

23   phrases in the defense memorandum presented to the Kansas

24   magistrate judge where the defense says -- points to all of

25   the photographic and video evidence of Mr. Chrestman

1    literally committing the charged crimes; and so the brief

2    says:   What is left to obstruct?

3              So perhaps this was meant as a purely rhetorical

4    term or phrase; but could you respond to that question,

5    Mr. Berridge?

6              What does the Government think is left to obstruct

7    in this case?

8              MR. BERRIDGE:   Your Honor, that's -- the

9    Government was also struck by that phrase as well.

10             I do think that -- certainly that a jury at trial,

11   or any factfinder would be particularly interested to see

12   what, if any, physical evidence that the Government could

13   find to corroborate the acts at the Capitol committed by

14   Mr. Chrestman.

15             For instance, the rest of the co-conspirators --

16   we have found at least some evidence, the clothing that they

17   were wearing -- the tactical gear that they were wearing at

18   the Capitol; we have found none of that for Mr. Chrestman.

19             And unless the defense at this point is saying

20   that he was in the Capitol, and that the Government doesn't

21   need any other evidence, and will not be challenging that

22   identity or his conduct, that it's all a matter of mens rea

23   at this point -- maybe that's the argument, Your Honor.  But

24   the Government certainly is interested in recovering

25   corroborative evidence in this case.

1          And we do think that the factfinders, specifically

2     the jury in D.C., will be particularly interested in whether

3     the Government was able to recover any sort of corroborative

4     evidence.  At this point we have not during the search of

5     the premises.

6          And we are concerned that if Mr. Chrestman is

7     released he will continue to obstruct; and wherever he put

8     any of those clothing or items that he was wearing, using at

9     the Capitol, including the ax handle that he was using --

10    that he would take that and further obstruct it and make

11    sure that it's gone permanently, if he hasn't already

12    destroyed it; and then not to mention the other potential

13    charged -- specifically uncharged co-conspirators at this

14    point that may exist as well.

15         But we're specifically -- we disagree certainly

16    that there is nothing left to obstruct in that I think that

17    a D.C. jury would be very interested in whether the

18    Government could find some of this corroborative evidence.

19         THE COURT:  All right.  Thank you.

20         Is there anything further that you want to point

21    me to before I turn to Mr. Redmond and Ms. Ramsey?

22         MR. BERRIDGE:  No, Your Honor.

23         Just a couple of quick clarifications I told

24    Ms. Ramsey and Mr. Redmond that I would make for the Court.

25         The Government, in its pleadings, said that there

1    were no firearms that were recovered in the premises.  There

2    was a handgun that was recovered in a car --

3            THE COURT:  When you say the "premises," you mean

4    during the search of Mr. Chrestman's house?

5            MR. BERRIDGE:  That's correct, Your Honor.

6            There was a Jeep parked in the driveway, and the

7    FBI saw a handgun in the car.  So not all of the firearms

8    were removed.  I apologize.  I just wanted to make a quick

9    point of clarification.

10           But it was specifically that POYB assault rifle

11   that they could not find and that they knew should have been

12   in that house.

13           And there is also a mention -- the numbers from

14   Mr. Chrestman's actual home that were potentially removed.

15   The Government stands by their representation.  It was

16   observed by a task force officer from the FBI who was

17   performing surveillance on the house that he saw numbers on

18   the house while conducting surveillance.  They also -- then

19   the FBI received a tip that the numbers had been removed.

20   And they no longer -- the numbers were no longer on the

21   house when they actually conducted the search warrant.  So

22   for that the Government stands by its representation there.

23           I know that there was previously a disclosure made

24   by the AUSA in Kansas saying that there was some uncertainty

25   that existed about that; but we have since cleared that up.

1    I just wanted to put that on the record as well.

2                    THE COURT:  All right.  Thank you.

3                    MR. BERRIDGE:  Thank you, Your Honor.

4                    THE COURT:  All right.  I will turn to the

5    defense.

6                    Mr. Redmond, you said something about splitting up

7    arguments; so I will leave it to the two of you, Ms. Ramsey,

8    Mr. Redmond, who would like to address your response.

9                    MR. REDMOND:  Thank you, Your Honor.  I will defer

10   to Ms. Ramsey.

11                   MS. RAMSEY:  Thank you, Your Honor.

12                   Before the Court opens for questioning, I wanted

13   to just proffer some information regarding some 3142(g)

14   history and characteristics of Mr. Chrestman that were

15   verified by our pretrial services department here.

16                   Mr. Chrestman was originally born in California;

17   he completed high school there, went to a few years of

18   junior college.  He then entered the Army where he served

19   four years as an Army medic private class.  He was honorably

20   discharged after serving four years.

21                   After the Army, he worked some kind of temp job in

22   a group home until he began working as a sheet metal union

23   worker local -- in Kansas City, Missouri, Local 2; he did

24   that from, approximately, 2006 to 2001 (sic).  And he

25   provided verification of employment records as well, which

1    we attached to the original detention memorandum for that.

2              He was laid off due to COVID.  And then he had

3    some back issues and injuries and difficulties, which he

4    does receive 40 percent disability and veteran benefits for

5    that.

6              He has lived at his primary residence in Olathe,

7    Kansas for approximately 17 years.  He has raised a family

8    in Kansas.  He has three daughters.  He shares custody of

9    his youngest daughter part-time that he takes care of.  And,

10   by all accounts, he is a good father and a family man that

11   cares deeply about his children.

12             We know that we have verified that he has lived in

13   that home for that period of time, and his name is on the

14   mortgage.

15             He has no mental health issues; not a drug user.

16   No real criminal history, except for two speeding tickets;

17   and I will address that -- another thing in the Government's

18   memo in short order here -- providing prior convictions.

19   And he also does not have any passport or any travel outside

20   of the United States.

21             It's clear based on the fact that he really

22   doesn't have a criminal history that he's never missed any

23   court appearances or -- and was not under criminal justice

24   sentence at the time of the allegations.

25             Regarding some of the facts the Government's

1     proffered, there are several things we'd like to address.

2              First, regarding the removal of the numbers from

3     the home, as Mr. Berridge mentioned at the detention

4     hearing, Government counsel in Kansas, Mr. Scott Rask,

5     clarified to the Court that it was uncertain whether numbers

6     existed at the time on or before the surveillance of the

7     house.

8              We would argue that we are unsure basically -- I

9     reached out to Mr. Berridge prior to this hearing; and

10    despite his clarification, we would dispute that.  We

11    interviewed his -- a child and his long-term girlfriend that

12    he has that he lives with.  And my understanding is that

13    there were not numbers on the home long before January 6th,

14    based on their removal for painting the home, and they were

15    simply never put back up.  So this was not an indication

16    that he was attempting to hide himself in some way from

17    authorities.  It's somewhat of a wrong (sic) proposition

18    because, with technology, you can simply Google an address

19    and locate the house or even look at the numbers on the

20    neighboring house.  I am not sure -- either way, it just

21    isn't true.

22             Regarding the second issue we'd like to address,

23    the Government mentioned in their detention memorandum that

24    Mr. Chrestman had a prior arrest in the 1990s for a firearms

25    offense.  My understanding is they are basing that off of an

1   NCIC report or information of an arrest; and we would

2   dispute that he had any prior arrests for any firearms

3   offense.  That is simply just not true.

4          And we want to also proffer to the Government

5   information that is not -- it is in our, I think, detention

6   memorandum that he had been attempting to contact counsel;

7   and this goes to regarding flight.

8          I will submit to the Court that Mr. Chrestman did

9   contact our office twice, on January -- once, Your Honor,

10  about January 26th and then, again, on around February 4th;

11  this was in regard to concerns that he had with media

12  reports about being possibly under investigation.  We

13  weren't aware of an open investigation.  We advised him

14  accordingly through his wife.  But he was calling and did

15  inquire about turning himself in; we were simply unaware of

16  an open investigation at that time.  So we initially

17  contacted an attorney that contacted me, and we had

18  subsequent contact with Mr. Chrestman.

19         I think it's also -- the proffer, additionally, I

20  would make is that -- regarding evidence the Government has

21  not put forth, which is that Mr. Chrestman -- it does not

22  seem that there is any evidence that Mr. Chrestman before

23  January 6th made any actions to organize or made any

24  statements regarding the event; nothing on social media or

25  any information or evidence that he has done any such

1     actions or had made any statements afterwards.

2          Mr. Chrestman -- so we would make the proffer of

3     that evidence and information which was verified, most of

4     it, by our pretrial services reports here regarding

5     history and --

6          THE COURT:  I think -- I think, Ms. Ramsey, what

7     you are going through here is clearly -- particularly in a

8     conspiracy charge it's -- before anybody with common sense,

9     looking at a situation like this, the extent of

10    preplanning -- the extent of planning for an assault on the

11    Capitol is indicative of danger to the community.

12         And I -- I have pictures where it shows this

13    defendant with three different headgear things:  A hat, a

14    helmet, gas mask -- that requires some preplanning, you

15    know, what to bring to Washington, D.C.  He is not planning

16    on looking at the sites which are now -- sites around the

17    Capitol which are totally off limits to all citizens who

18    live in this wonderful, beautiful city.  It's a really

19    militarized zone right now, surrounded by barbed wire,

20    concrete, tall fences, trucks blocking the roads, national

21    guardsmen with big guns.  So he wasn't coming to stroll

22    around the reflecting pool, to look at the sites, the

23    monuments.  He was coming with a gas mask, a hard helmet, an

24    ax handle -- he had some preplanning there.

25         So you don't need to talk to me about how long he

1    has lived in this house; flight risk is really not the issue

2    here.

3            Danger to the community is an issue.

4            And how should I view this preplanning that this

5    defendant engaged in before he took his trip to the nation's

6    capital?  Does he always walk around with three different

7    pieces of headgear?  Is that normal?

8            MS. RAMSEY:  I will -- I'm sorry.

9            THE COURT:  I'm sorry, Ms. Ramsey.

10           MS. RAMSEY:  It's quite all right, Your Honor.  I

11   apologize for interrupting.

12           I will let Mr. Redmond address that.

13           THE COURT:  I mean, I am giving you an invitation

14   to address how that doesn't show a danger to the community:

15   Helmet, gas mask, ax handle, preplanning to come to this

16   city, the nation's capital; and that's what he planned to

17   bring with him here, tactical gear, tactical vest.

18           How does that undercut, in any way, the

19   Government's showing of danger, or does it bolster it?

20           MR. REDMOND:  Your Honor, if I could.  I believe

21   Ms. Ramsey's proffer, I think, has concluded except for one

22   thing.

23           Do I have permission to answer the Court's

24   question?

25           THE COURT:  Yes.  Either one of you, please

1    proceed.

2              Ms. Ramsey, were you just addressing flight risk;

3    was that your role?

4              MS. RAMSEY:  Yes, Your Honor.  Yes.

5              I was largely addressing flight risk and wanted to

6    make sure that Your Honor has the information.  I wasn't

7    sure whether it was --

8              THE COURT:  Okay.  Your presentation is fairly

9    persuasive on that.  I think the Government's essentially

10   conceded already that flight risk is not the main reason for

11   detention here.

12             So I will turn to Mr. Redmond.

13             MR. REDMOND:  Thank you, Your Honor.

14             THE COURT:  Mr. Redmond, it looks to me like he's

15   got some preplanning going on here -- not only preplanning,

16   but coordination; coordination when he got here; leadership,

17   leading this mob; giving them verbal guidance on where to

18   go, what to do; threats, verbal threats to police officers.

19             He used his wooden club, his ax handle, to stop

20   barriers from coming down that the police wanted to put down

21   to stop the mob.  Why isn't all of that probative of his

22   danger to the community?

23             MR. REDMOND:  It is, Your Honor.

24             I think if you had conducted a -- if Mr. Chrestman

25   had been before you the morning of January 6th and you knew

1     what was in his mind at that point, he would have been a

2     danger to the community.

3            But the fact that he may have been a danger to the

4     community on January 6th does not mean that he is on

5     February 23rd because a lot has --

6            THE COURT:  You know, that's really interesting,

7     Mr. Redmond.  It's an interesting argument -- I read it in

8     your defense memo -- that suggests that his arrest on

9     federal charges has chastened rather than emboldened him;

10    powerful words; that he has experienced the clarity of

11    perspective sometimes imparted by a federal prosecution and

12    associated incarceration.

13           And my response to that is decisions -- sometimes

14    the in -- what, you know, in legal parlance called the

15    in-out decision -- release or detention decision under

16    Section 3142 -- would be so much easier for all of us judges

17    whether you are sitting in Kansas, like the magistrate judge

18    here, or me sitting in D.C. -- if, after being arrested, a

19    defendant said:  Whoops, made a mistake here.  Just let me

20    out; I will be good now.  I mean, if that was enough for

21    pretrial release, that would make it a very easy decision

22    for all of us across the federal courts in this country.

23           To me, that is essentially what your argument is;

24    isn't it?

25           MR. REDMOND:  It is.

1          THE COURT:  You're saying a "whoops" now?

2          MR. REDMOND:  Well, I don't think that that

3    position is available for most of the people that come

4    before the Court.

5          Because in this case you have a single data point

6    about Mr. Chrestman's dangerousness that's arrayed against a

7    background of a guy that lived a very normal life.  He was a

8    sheet metal worker; he raised his kids.  And the unique

9    confluence of events that resulted in January 6th has also

10   changed; it's not just him.

11         And I would proffer to the Court -- Mr. Chrestman

12   knows this is the biggest mistake of his life, being in

13   Washington, D.C. that day; and his conduct since that day is

14   consistent with him being chastened.

15         When the Kansas City Star calls on the 24th of

16   January, he doesn't use that phone call as a megaphone to

17   brag about the Proud Boys or endorse the events of

18   January 6th.

19         THE COURT:  But, Mr. Redmond, let me just

20   interrupt you for a second because this is what I want to

21   know, has the defendant -- is there anything in the record,

22   including that Kansas City Star report -- I haven't read it,

23   but I have just seen the little excerpts that you have put

24   in your briefing.

25         But is there anywhere in that interview that this

1    defendant expresses remorse?  Does he reject the Proud Boys?

2          Does he express remorse and reject this gang of

3    nationalistic individuals?  Does he reject the fantasy that

4    the election was stolen?  Does he reject the position that

5    animated this mob on January 6th?  That, I haven't seen.

6          Is there anything in the record about any of those

7    things?

8          MR. REDMOND:  The most direct thing I can point

9    you to, Your Honor, is the proffer about his view of what's

10   happened on January 6th.

11         At some level, I am limited by the fact that I am

12   going to have successor counsel.  I would like to be able to

13   make these decisions in front of the Court now and have a

14   statement like that issued; but I just feel a little bit

15   constrained because this case is going to go to another

16   lawyer.

17         But I would argue that all of his conduct is

18   corroborative of the idea that he did not -- that he

19   experienced what we have referred to in the briefing as a

20   break in the fever dream.  The Proud Boys nationally are --

21   "falling apart" is too strong; but there is a lot of

22   disunity in that organization.  As you noted --

23         THE COURT:  You call it an "organization"; I call

24   it a "gang."  I mean, it's a group that clearly, by the

25   events of January 6th, has criminal purposes.  It's a gang.

1          And we are not going to debate that here; but the

2     fact that he continues to be a member of the Proud Boys is

3     danger enough; isn't it?

4          MR. REDMOND:  I don't think there is any

5     indication that he's -- I mean, there's no evidence in the

6     record that I am aware of that he has had any contact with

7     any Proud Boys since January 6th.

8          THE COURT:  All right.  Well, let me go on.

9     Because you do make a novel argument that I found quite

10     interesting given what is overwhelming evidence in this case

11     of the videotapes and the photographs; and I think you, in

12     so many words, concede that in the defense memo filed in

13     Kansas.

14          But, nevertheless, in order to -- doing your job

15     very well trying to undercut the strength of that evidence,

16     which is one of the important factors I have to look at in

17     making this in-out decision under 3142 is -- you make this

18     argument that he has a viable defense of acting at the

19     behest of federal officials in his assault on the Capitol.

20          And as part of your discussion of this viable

21     defense, you mentioned the republican mainstream, the Trump

22     campaign; I guess, by that, you are referring to republican

23     elected officials and republican campaign officials as the

24     "federal officials."

25          And you also mentioned then President Trump,

1    that -- and as I understand your argument, the republican

2    elected officials, the Trump campaign officials, Mr. Trump

3    himself, all gave him -- what he understood to be

4    instructions to assault the Capitol and that somehow he

5    should be excused from criminal liability because of his

6    following of these instructions.

7            Is that basically your argument?

8            MR. REDMOND:  Well, I readily concede that there

9    is nothing in that trilogy of Supreme Court cases that

10   addresses the facts of a President standing up and inciting

11   and enabling an insurrection; that law will, I am sure, be

12   worked out going forward.

13           When I read those cases, though, it makes me think

14   of some of the imperfect, sort of, sentencing defenses in

15   the sentencing guidelines; things like imperfect public

16   authority defense where one could well take the position at

17   sentencing, even if Mr. Chrestman is convicted, that this

18   incredibly unique confluence of events and the directions of

19   somebody who had forcefully associated himself with the

20   Proud Boys, from the beginning to the end of the debate --

21   the presidential debate -- that that is at least relevant to

22   determining whether Mr. Chrestman presents a lower than

23   usual risk of recidivism going forward.

24           I don't pretend to tell the Court that this is a

25   defense I would raise; but it seems interesting that in an

1      analogous context the Supreme Court that -- fairly clearly

2      held that:  If the Government tells you to do something,

3      they can't punish you for doing it.  I have no idea how that

4      will play out in this case; I think it's only, sort of, part

5      of the consideration in determining dangerousness.

6                THE COURT:  Well, I do think that an argument that

7      because former President Trump instructed a mob to storm the

8      Capitol could lead to the argument that an elected

9      official -- including President Trump, who, for four years,

10     bragged that if he murdered somebody on Fifth Avenue his

11     followers would still follow him -- he brought up time and

12     again the murder analogy; that if President Trump ordered

13     and instructed members of this Proud Boy gang to go murder

14     somebody, and they went off and do it -- went off and did

15     that following that instruction, that that would somehow be

16     a complete legal excuse that would immunize them from

17     criminal liability for that criminal act.  I mean, in

18     effect, isn't that what your argument is saying?

19               MR. REDMOND:  So I don't think so because it's not

20     going to extend to every offense that's charged against

21     everyone.  Going to the Capitol, maybe even entering the

22     Capitol -- perhaps this is a defense to those charges;

23     again, I don't know on these facts.

24               Other things are going to be much -- we have to

25     slice the proverbial onion and figure that out.  It's odd

1    because it's a trio of cases that seem to have fairly

2    defense-friendly language that I never heard of before; and

3    I don't see it cited very much in the courts of appeal.  So

4    I don't have the best answer in the world for you, Your

5    Honor.

6         THE COURT:  Well, I think that's because the

7    Supreme Court case -- let's just take *Cox v Louisiana* as an

8    example.  I mean, the Supreme Court made it very, very clear

9    in *Cox v Louisiana* that -- to the extent somebody could rely

10   on what they were told by a Government official to do,

11   something that ultimately ended in criminal charges -- and

12   in *Cox v Louisiana* the Supreme Court reversed that

13   conviction -- it had to be on some kind of narrow -- what

14   they called the traffic regulation.  That somebody in a

15   traffic context could, sort of, rely on the local police

16   guy, police official, who said:  You could demonstrate on

17   that sidewalk, but you can't demonstrate on the sidewalk

18   nearer to the courthouse.  They said, basically, that's the

19   kind of narrow, administrative function and discretion that

20   a police officer on the ground can exercise.  And they

21   expressly said:  We're not talking about something like

22   relying on an elected official to give you instructions to

23   commit murder or robbery; that's really far off by the pale

24   of what they were ever referring to.

25         In this case, I would say:  An instruction from a

1    federal official to disrupt a constitutionally-mandated

2    function is far different from a traffic kind of

3    administrative decision.

4            Is there anything else that you want to add to

5    your argument, Mr. Redmond?

6            MR. REDMOND:  The only thing is I -- something

7    else occurred to me.

8            To your point about the fact that if defendants

9    were arrested and then just said:  Hey, I am okay now; you

10   should release me.  I understand exactly where the Court is

11   coming from.  But I think, in most cases, that's not going

12   to be -- that position would be completely unpersuasive to

13   the Court, especially in the context of somebody that had a

14   criminal history -- or somebody even that didn't have a

15   criminal history but was a Proud Boy, and there was evidence

16   that they were participating in a street fight during the

17   protests, or something like that.

18           This is a case where -- I mean, Mr. Chrestman was

19   living in something of an echo chamber, and that has now

20   broken apart, as has a lot of the gang that the Government

21   alleges that he belonged to.

22           What he wants to do, what he hopes to do if he is

23   released, Your Honor, is -- there is some repairs in his

24   home that he needs to get done.  He needs to get his partner

25   onto his bank account.  He wants to spend some time with his

1   children.  And he is clear-eyed about the fact that, after

2   that, he will very likely be going to prison.

3           And we very much appreciate the Court's allowing

4   us to participate in the hearing this morning.

5           THE COURT:  Thank you.

6           Mr. Berridge, your motion; you get the reply.

7           MR. BERRIDGE:  Yes, Your Honor.

8           Just very briefly.  I will keep it brief.

9           While we understand -- while Mr. Redmond makes, as

10  Your Honor pointed out, an interesting legal argument, we

11  think that that merely just provides context and motivation

12  for what Mr. Chrestman did on that day, and in no way

13  excuses it or in any way, sort of, diminishes his danger to

14  the community.

15          I think Mr. Redmond incorrectly points out that

16  the fever has broken and that there is no longer an echo

17  chamber.  I don't think that it takes particular FBI

18  sleuthing to see that that's not, in fact, true.  You can

19  still go onto the internet, and still go onto various

20  sites -- really on any side of the spectrum and see that

21  there is still plenty of risk with political violence, that

22  it's not outdated.

23          As the Court pointed out, just across the street

24  there is an entire national guard apparatus designed to

25  prevent this from happening in the near future.

1        THE COURT:  I know.  And so for the people who

2   live in Washington, D.C., for the Americans who want to come

3   visit their capital, are they ever going to be able to walk

4   where we used to walk freely?  It's unclear.  Unclear.

5   Shockingly unclear.

6        MR. BERRIDGE:  That's correct, Your Honor.

7        So the Government respectfully disagrees with

8   Mr. Redmond's position on that point.

9        There is no evidence that Mr. Chrestman would --

10  has left the Proud Boys, or that he is willing to put that

11  all behind him and that he will just go back home and get

12  his affairs in order, and that he is going to just basically

13  not participate any longer in any of these associations with

14  violent actors or potentially violent actors.

15       THE COURT:  Well, let me just ask you.

16       The magistrate judge in Kansas clearly thought

17  Mr. Chrestman posed a sufficient danger that he essentially

18  put him in lockdown in his home with geolocation monitoring.

19  But to the extent that the echo chamber that caused him to

20  have this fever to come to engage in an assault on the

21  Capitol is ongoing on the internet, there is nothing in the

22  conditions of release that precludes that it would even be

23  possible for Mr. Chrestman going online and rejoining or

24  re-inciting or re-recruiting other people; is that correct?

25       MR. BERRIDGE:  That is correct, Your Honor.

1          And it is essentially impossible to, sort of,

2     monitor that, whether or not he is accessing those -- those

3     means of association.  And it's not just the internet.  I

4     guess -- well, you could use the internet for messaging

5     platforms, et cetera -- that he could be using to continue

6     to communicate with other members of the Proud Boy -- Proud

7     Boys.

8          THE COURT:  All right.

9          The Government -- the Court is ready to rule on

10    the Government's motion to review the Kansas magistrate

11    judge's decision to release William Chrestman pending trial.

12         On an appeal from a magistrate judge's order of

13    pretrial release, the district court must conduct a *de novo*

14    review, and must do so promptly under 18 U.S.C. Section

15    3145(a).

16         The Bail Reform Act requires release of a

17    defendant prior to trial, unless a judicial officer

18    determines, after a hearing, that no condition or

19    combination of conditions will reasonably assure the safety

20    of any other person in the community under 18 U.S.C. Section

21    3142(e)(1).

22         The charged conduct in this case does not give

23    rise to a rebuttable presumption favoring detention and so,

24    therefore, the Government bears the burden to establish that

25    the defendant poses a risk of flight by a preponderance of

1    the evidence and/or a danger to the community by clear and

2    convincing evidence, under 18 U.S.C. Section 3142(f)(2).

3            In determining whether any conditions of release

4    will reasonably assure the appearance of the person as

5    required, and to minimize the risk of danger to the

6    community, the Court must take into account the available

7    information concerning four factors that are set out in

8    18 U.S.C. Section 3142(g).

9            Those factors are:  The nature and circumstances

10   of the offense charged; the weight of the evidence against

11   the person; the history and characteristics of the person;

12   and the nature and seriousness of the danger to any person

13   of the community that would be posed by the person's

14   release.

15           And in conducting this review, the Court must

16   examine the available information that touches upon or takes

17   account of these four statutory factors just listed.

18           I am going to start with the first factor, the

19   nature and circumstances of the offenses charged; and

20   these -- this factor weighs strongly in favor of detention.

21           He's been charged with five serious felony

22   offenses starting with obstructing, influencing, or impeding

23   any official proceeding or attempting to do so, in violation

24   of 18 U.S.C. Section 1512(c)(2).

25           And he is charged with violating this particular

1      statute in a number of ways -- and the evidence tends to

2      support this -- by encouraging others to take -- and that's

3      the defendant's word on recordings of his criminal conduct

4      as it happened -- take the Capitol building during the

5      certification of the vote count of the Electoral College of

6      the 2020 presidential election, by disrupting and pushing

7      past metal barriers used by law enforcement to keep rioters

8      out of the Capitol by forcefully entering the Capitol

9      through the disrupted metal barriers, by intentionally

10     preventing law enforcement from securing the premises

11     against unlawful -- the unlawful mob seeking to interrupt

12     the certification.  This offense alone carries 20 years'

13     imprisonment.

14             And this is not just any proceeding, but a

15     critical function required by the U.S. Constitution for a

16     peaceful transition of power in our democracy.

17             He is next charged with conspiring to commit an

18     offense against the United States, in violation of 18 U.S.C.

19     Section 371, for planning with his codefendants and others

20     to create mayhem on the Capitol grounds by intending to

21     disrupt the certification of the vote count of the Electoral

22     College, and impeding the Capitol Police that were trying to

23     ensure that that constitutional process proceeded

24     uninterrupted.  That offense carries 5 years' imprisonment.

25             He is further charged with knowingly entering or

1     remaining in any restricted building or grounds without

2     lawful authority; and knowingly, with intent to impede or

3     disrupt the orderly conduct of Government business or

4     official functions, engaging in disorderly or disruptive

5     conduct in any restricted building or grounds while carrying

6     a dangerous weapon, in violation of 18 U.S.C. Section

7     1752(a)(1), (a)(2), and (b)(1)(A).  And, here, a "dangerous

8     weapon" is far more than just an assault rifle.

9          In this case, the defendant entered the Capitol

10    grounds with an ax handle and actually used this ax handle

11    to interfere with the protective metal barriers that the

12    police, Capitol Police, were trying to bring down to stop

13    the mob from coming into the Capitol and disrupting the

14    joint session of Congress.  This offense itself carries

15    10 years' imprisonment.

16         He's also charged with obstructing, impeding, or

17    interfering with a law enforcement officer lawfully engaged

18    in the performance of his official duties incident to the

19    commission of a civil disorder that adversely affects the

20    performance of a federally protected function, in violation

21    of 18 U.S.C. Section 231(a)(3).  And he did this by

22    encouraging other rioters to stop the Capitol Police from

23    making an arrest by attempting to disrupt or dismantle the

24    metal barriers being used by the police to control the

25    crowd, and preventing those metal barriers from being

1   lowered using his wooden ax handle so that police officers

2   couldn't secure areas within the Capitol.  That offense

3   carries 5 years' imprisonment.

4          Finally, he's charged with threatening to assault

5   a federal law enforcement officer with intent to impede,

6   intimidate, or interfere with that law enforcement officer

7   while engaged in the performance of the official duties, in

8   violation of 18 U.S.C. Section 115(a)(1)(B), because we have

9   a recording of Mr. Chrestman yelling at Capitol police

10  officers who were trying to defend the Capitol against this

11  mob saying:  "You shoot and I'll take your fucking ass out!"

12  That offense carries up to 6 years' imprisonment.

13         He is also charged with a misdemeanor offense I

14  won't go into.

15         These six charges, as I have said before, don't

16  properly capture the scope of what was going on on

17  January 6th.  And we continue, as I have mentioned, living

18  with the aftermath of that, with a militarized zone on

19  Capitol Hill.  We, who live here in the nation's capital,

20  our beautiful capital, see this every single day.

21         The Government has presented overwhelming evidence

22  that Mr. Chrestman was not only present at the U.S. Capitol

23  for the events on January 6th, but he was -- he did more

24  than just be merely present.  He took deliberate steps to

25  stop the police in their effort to allow the democratic

1    process underway inside to continue to a successful end.

2           We have videos -- we have photos of the defendant

3    shortly before the riot began wearing his black baseball

4    hat, camouflage pants, green tactical vest, and carrying a

5    wooden ax handle, which was initially wrapped in a blue flag

6    but became unwrapped; in other pictures we see what looks

7    like a very strong, thick piece of wood.

8           Armed with his wooden club, his marked helmet, we

9    see him talking to other Proud Boys, and then marching with

10   these Proud Boys to the Capitol grounds.  And then, as the

11   mob advanced towards the Capitol building, he was one of the

12   people in the lead helping to knock down the metal police

13   barriers, standing right in front of Capitol police officers

14   attempting to guard the building, which is when he yelled:

15   "You shoot and I'll take your fucking ass out"; threatening

16   the police officers who were simply trying to do their duty

17   and allow a constitutional function to proceed.

18          And, also, when the Capitol Police actually tried

19   to arrest a member of the mob, the defendant encouraged

20   others in the mob to stop the police, saying:  Don't let

21   them take him.  The crowd pressed on further.  The defendant

22   put on his helmet, marked with the orange tape so one Proud

23   Boy could see another Proud Boy gang member; traded in his

24   helmet, unwrapped his weapon, and turned and addressed the

25   crowd saying:  "Whose house is this?"  "Do you want your

1   house back?"  And then told the crowd to take it, as a

2   leader guiding this crowd and this mob to go further in

3   breaching the Capitol.

4          At some point he also took off the black helmet,

5   put on his gas mask.  So he was well prepared.  He came well

6   prepared to the Capitol in case the police tried with

7   physical force to stop the crowd.  He was protecting his

8   head.  He was protected from tear gas or other methods that

9   police use to control mobs.  He came prepared for what he

10  anticipated was going to happen and, then, when he

11  encouraged the mob, to make happen at the Capitol by telling

12  them to take the Capitol.

13         Once they successfully breached the building, he

14  used his club, ax handle, to stop the police from being able

15  to bring down metal barriers so that the mob could get in.

16         He then traveled all the way back -- having

17  traveled from Kansas to destabilize the democracy, and then

18  traveled all the way back home.  And since then, from what I

19  can see in the record, he has shown no remorse for this

20  egregious conduct at the Capitol.

21         And to the extent that counsel has raised a viable

22  defense that he believed his actions were sanctioned by

23  elected republican officials and by then President Trump,

24  this purported defense, if recognized, would undermine the

25  rule of law.  Because then, just like a king or a dictator,

1    the President could dictate what is illegal and what isn't

2    in this country, and that is not how we operate here.

3         The nature and circumstances of this offense

4    clearly weigh in favor of pretrial detention.

5         The weight of the evidence is overwhelming,

6    strongly favors detention.  Between the video footage, the

7    photos of the defendant in the crowd, interfering with

8    police barriers, confronting law enforcement, threatening

9    law enforcement to kill them; leading the mob and his

10   co-conspirators to keep the metal barriers open so that

11   people could get -- the mob could get in -- it all weighs

12   heavily in favor of pretrial detention.

13        The history and characteristics of the defendant

14   are -- he has a very limited criminal history.  He has

15   strong ties in the area where he resides.  As defense

16   counsel pointed out, he has lived in Kansas City in his own

17   house for 17 years.  He has children, and he had a job, and

18   he was a veteran of the U.S. Army and was honorably

19   discharged.  This is all to his credit, but this is all in

20   the past.

21        And what this Court looks at is:  What's the

22   danger that his more recent and charged conduct shows?  And

23   that conduct poses a danger.

24        His conduct after January 6th also raises some

25   serious questions about whether he was trying to obstruct or

1    conceal evidence.  He was aware, after his interview on

2    February 4th with a local newspaper that had identified him

3    as having a role in the Capitol mob riot, that he might face

4    charges; and he didn't flee.  He also didn't voluntarily

5    surrender.

6          The Government also proffers that when they

7    searched his house at the time of his arrest, a number of

8    things were missing that could corroborate his role on

9    January 6th; his clothing, the ax handle.  And they found

10   his cell phone in the dresser drawer of the bedroom of his

11   six-year-old child.  They didn't find any of the tactical

12   gear, the black helmet marked with the orange tape, the gas

13   mask.  They didn't find the firearm with the Proud Boy gang

14   insignia or logo on it that could have also confirmed his

15   close identity and membership in that gang.

16         So the fact that the defendant didn't flee does

17   little to mitigate -- and doesn't pose a risk of flight --

18   doesn't mitigate the heavy weight of the other factors that

19   favor detention in part due to his danger to the community

20   and the fact that he engaged in some conduct where there is

21   a lot of missing evidence.

22         The fourth factor, the nature and seriousness of

23   the danger to the community posed by the defendant's

24   release, also is heavily in favor of detention.  His conduct

25   on January 6 showed a clear disregard for the safety of

1    others.  He not only violated the law himself, he encouraged

2    others to do so; made it easier for others in the mob to

3    obstruct police barriers, all the while shouting threats at

4    the Capitol Police, leading others in an effort to take

5    quote-unquote the Capitol.  His participation and de facto

6    leadership role in the assault on the Capitol is

7    demonstrative of the fact that he remains a member of the

8    Proud Boys; he's made no effort to distance himself from

9    that group since January 6th.  All of these factors lead to

10   a conclusion that he poses a danger to the community and

11   that there are no condition or combination of conditions

12   that will assure his appearance as required or compliance

13   with the release conditions.

14        His danger is not just to the community in Kansas

15   City where he may live or in Kansas, but to all American

16   citizens.

17        I don't want to mince words about the factors that

18   are of enormous concern to this Court, so I am just going to

19   spell them out:  Preplanning -- he had preplanning, that's

20   the only way he comes to the nation's capital rather than

21   with a camera, comes with a gas mask, a hard helmet, and a

22   club; his coordination with other gang members; he has the

23   gear to help ensure success in overcoming the police,

24   including a helmet and a gas mask for defensive use, and a

25   weapon in the form of a large club for offensive use against

1    the police in their effort to stop the mob; his use of force

2    to push forward to enter the Capitol; his use of words to

3    lead and guide the mob to push forward against the police

4    barriers; verbal threats to police to intimidate and back up

5    his threatened use of force with his club; all with total

6    disregard of the law and for official directives; and these

7    actions by the defendant contributed successfully to disrupt

8    the democratic process for hours while terrorizing elected

9    representatives, staff, and media inside.

10           This is a very upsetting and traumatic day for

11   many Americans.  It was an embarrassing spectacle of this

12   country for the rest of the entire world.  And the

13   conditions crafted by the magistrate judge in Kansas were

14   intended to keep this defendant locked up in his home.

15           But he was at his home when he engaged in his

16   preplanning and his coordination for what happened on

17   January 6th.  He was in his home when many of the items we

18   see in the videos and photographs went missing.  His very

19   actions on January 6 make plain this defendant will follow

20   his beliefs and the mob even when the law designed to

21   protect our democracy says otherwise.  All of this

22   demonstrates he cannot be trusted to abide by any conditions

23   of the release the Court might impose instead of pretrial

24   detention.

25           So, in short, the Court respectfully disagrees

1    with the magistrate judge in this case.  I do not find this

2    case to be a close call at all.

3              So upon consideration of the proffered evidence

4    presented, the factors set forth in 18 U.S.C. Section

5    3142(g), the Court finds all four statutory factors weigh

6    heavily in favor of pretrial detention.  The Government has

7    met its burden of establishing that there are no conditions

8    or combination of conditions that will reasonably assure the

9    safety of any other person in the community by clear and

10   convincing evidence.

11             The magistrate judge's pretrial detention ruling

12   is, therefore, reversed.  The Government's motion for

13   pretrial detention is granted, and the defendant will be

14   held without bond pending trial.

15             Mr. Chrestman is directed to appear at the

16   previously scheduled hearing before Magistrate Judge

17   Meriweather in this court on February 26, 2021, at

18   1:00 p.m., unless he is indicted before then.  And if he

19   should be indicted before then, he will appear to a judge to

20   whom his case is randomly assigned.

21             I will issue a written memorandum opinion that

22   will be filed shortly.

23             Is there anything further today from the

24   Government?

25             MR. BERRIDGE:  No, Your Honor.  Thank you.

1           THE COURT:  And I did not -- I denied the

2     transport order for Mr. Chrestman.  So now that he is being

3     detained pretrial until his Indictment and review by the

4     judge to whom his case is randomly assigned, do I need to

5     enter the transport order now?

6           MR. BERRIDGE:  Yes, Your Honor.  It would

7     be the -- I think it would make sense to go ahead and enter

8     the transport order now just to get that process started

9     because it can take a while as you know --

10          THE COURT:  And that's part of the reason that I

11    had changed my reviews of the magistrate judge release

12    orders; that's why I'm doing these remotely, rather than

13    waiting for the transport to get here, because I think the

14    defendant is entitled to a prompt resolution and review of

15    that.

16          Mr. Redmond or Ms. Ramsey, do you want to be heard

17    on that?

18          MR. REDMOND:  No.  We do not, Your Honor.

19          THE COURT:  All right.  Okay.  So I will enter a

20    transport order now.

21          MR. BERRIDGE:  Thank you.

22          THE COURT:  All right.  Is there anything further

23    from the defense?

24          MR. REDMOND:  There is not, Your Honor.

25          THE COURT:  Okay.  Thank you.

1          Thank you very much for your participation today,

2     the Court appreciates it.

3          MR. REDMOND:  Thank you.

4          THE COURT:  All right.  You are all excused.

5          MR. BERRIDGE:  Thank you, Your Honor.

6          (Whereupon, the proceeding concludes, 12:48 p.m.)
                              * * * * *
7                          **CERTIFICATE**

8          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
9     transcript of my stenographic notes, and is a full, true,
      and complete transcript of the proceedings to the best of my
10    ability.

11         PLEASE NOTE:  This hearing was held via
      videoconference and in compliance with the COVID-19 pandemic
12    stay-safer-at-home orders and is therefore subject to the
      limitations associated with the use of technology, including
13    but not limited to telephone signal interference, static,
      signal interruptions, and other restrictions and limitations
14    associated with remote court reporting via telephone,
      speakerphone, and/or videoconferencing capabilities.

15
           This certificate shall be considered null and void
16    if the transcript is disassembled in any manner by any party
      without authorization of the signatory below.

17

18
      Dated this 8th day of March, 2021.
19

20    /s/ Elizabeth Saint-Loth, RPR, FCRR
      Official Court Reporter
21

22

23

24

25